# VISER VS. BERTRAND.

The contract of a married woman for professional services in obtaining a divorce, may be enforced upon her express promise to pay after she becomes discovert without any new or further consideration for the promise.

But money advanced to the husband at the request of the wife, in consideration of his making no opposition to a bill for divorce—being for an illegal and immoral consideration, cannot be recovered against her on her express promise to pay.

And if the evidence conduced to show that any part of the demand in suit was upon such a contract, it would be the duty of the court, of its own motion to instruct the jury, that the plaintiff could not recover for so much of his demand.

A negotiable note given and accepted for the debt of a third person is an extinguishment of such debt; and proof of this is sufficient evidence to support an action against the debtor for money paid.

*Error to the Circuit Court of Pulaski county.*

Hon. W. H. FEILD, Circuit Judge, presiding.

FOWLER, for the plaintiff. The main questions in this case arise upon the vicious and illegal consideration at the foundation of the contract sued on. Part of which was made by a *feme covert* for professional services, and of course void on that ground alone; the other upon an unlawful arrangement between the solicitors of herself and her husband, to obtain a decree of divorce from the Circuit Court, in violation of the statute regulating divorces, and void, both on account of its immorality, and because she was a married woman.

All contracts of a married woman are void—mere nullities. 1 *Com. on Con.* 172, 173. *Pow. on Con.* 57, 58, 36. *Story on Con.* sec. 62, 70, 71. *Chit. on Con.* 39. *Corbell vs. Poeltnitz,* 1 *T. R.* 8. *Ch. on Bills,* (9 *Am. Ed.*) 21. 2 *Saund. Pl. & Ev.* 571. 3 *Paige Rep.* 121. 16 *J. R.* 286. *Marshall vs. Rutton,* 8 *T. R.* 547.

In order to bind a woman by a subsequent undertaking to per-

form her contract made during coverture, (if it can be done at all) there must rest upon her, as such consideration, a strict and undoubted moral obligation, and certainly it does not exist in this case. *Ch. on Con.*, (*Ed. of* 1834,) *p.* 12. *Smith vs. Ware*, 13 *J. R.* 259. 13 *J. R.* 382.

The agreement by Mrs. Viser to give her husband $300, through the agency of Bertrand and English, their solicitors, amounts simply to a *purchase* from her husband of a divorce—a palpable evasion of the statute—a contract in violation of good morals—contrary to public policy; and if so necessarily void. *Dig. p.* 441. *Ohio Life Ins. Co. vs. The Merchants Ins. & Trust Co.*, 11 *Humph. Rep.* 10. *Craig et al. vs. Missouri*, 4 *Pet. Rep.* 436. *Story on Con. sec.* 218, 226. 10 *Humph.* 11. And neither party can have any remedy on such a contract. 11 *Humph.* 10. 4 *Pet.* 188. 6 *T. R.* 410. *ib.* 62. *Story on Con.* 208, 137, 202, 205. 2 *Saund. Pl. & Ev.* 576. 6 *Cond. Rep.* 305. 1 *John. Ch. Rep.* 490. *Livingston Law Mag.* for Feb. 1853, p. 103.

Under the money counts, or rather count for money paid, it was necessary to prove the payment of money or its equivalent; and a promissory note is neither money or its equivalent. 2 *Stark. Ev.* 99. *Cumming vs. Hackley*, 8 *J. R.* 206. 2 *Saund. Pl. & Ev.* 678, 679. 1 *J. J. Marsh.* 505. 2 *Bibb.* 379. 11 *Ark.* 276.

Mr. Chief Justice WATKINS.

This was an action of assumpsit with a count for professional services, the common money counts, and an account stated, brought by Bertrand against Mrs. Viser, the plaintiff in error. The bill of exceptions disclosed a claim for $150, charged as an attorney's fee, and $300 money advanced for her, and at her request.

The evidence on the trial conduced to show the following state of facts. Bertrand had been the attorney of Mrs. Viser in prosecuting a suit in the Pulaski Circuit Court, against her husband for divorce, and for his services in conducting that suit, the fee of $150 was charged. It appears that Mrs. Viser had several negroes, which she claimed as her separate estate, but in which Viser also claimed an interest by virtue of his marital rights.

Mrs. Viser, the complainant, was living in Little Rock, and Viser, the husband, was in New Orleans. A negotiation ensued between the parties to that suit, through the medium of their respective attorneys, the result of which was, in the language of Viser's attorney, the only material witness to this point, that "Mrs. Viser's attorney agreed that she would pay me $300 for Viser, if he would relinquish his claim to the negroes and make no further opposition to the divorce, which as Viser's attorney, I accepted." The attorney of Viser wrote to him at New Orleans, and obtained his deed of relinquishment of the negroes. The deed was executed to Bertrand, and delivered to him, with the understanding that, after the divorce, he was to convey to Mrs. Viser. Bertrand on behalf of Mrs. Viser, gave his obligation for the payment of the $300. Subsequently, in July, 1850, Mrs. Viser obtained a decree in the divorce suit, Viser making no opposition. The payment of the $300, was delayed for some time after the decree, the excuse being that Mrs. Viser had not succeeded in raising the money by the sale of one of the negroes, as was intended, and which she made some efforts to do. According to my understanding of the record there was evidence conducing to show that Mrs. Viser, after the divorce, requested Bertrand to advance the money for her, until she could raise it by a sale or mortgage of one of the negroes, or from which the jury might have inferred the fact of such request, which however, I do not regard as material. Finally, Bertrand, who, not long after the divorce, had paid $100 about the first of February, 1851, closed the matter by giving his note for the remaining $200 to Viser's attorney, who accepted it with the understanding that he would pay it whenever called on; the witness, however, up to the time of the trial, had not called on Bertrand for the money. There was abundant evidence showing that after the divorce Mrs. Viser, the defendant below, acknowledged her indebtedness to the plaintiff for his fee, which was agreed to be settled at $100 and also for the $300 advanced or assumed to be paid by him for her to Viser, and that she, on several occasions promised to pay him those sums.

On the trial in the court below, various instructions were asked for, the repetition of which in detail as given, modified or refused, would be as little calculated to elucidate the decision here as they were the issues before the jury. The points made on behalf of the defendant below were, as gathered from the instructions asked, that as the retainer of the plaintiff and the contract or agreement about the payment of the $300, had their inception whilst the defendant was a feme covert, such contract was absolutely void and not binding on her; and being so, no subsequent promise by her, after she became discovert, without some new or further consideration was shown to uphold it, would amount to a ratification, or make such new promise binding upon her in law  Secondly, that the plaintiff could not recover for money paid, as to so much of the claim for which he had given his note, and which did not appear to have been paid. The court below seeming to regard these propositions as law, instructed the jury on behalf of the plaintiff, that if they believed from the evidence that the defendant made a new contract, after the divorce was granted to her, upon a sufficient consideration, to pay the $300 and the fee, they might nevertheless find for the plaintiff under the count upon an account stated, but upon the return of the jury reporting a disagreement the court appears to have charged that, although the original contract was void in law, yet if she made a new promise to pay since she was divorced, the consideration received by her during coverture, is sufficient to sustain such new promise, which became binding so as to authorize a recovery against her in that action.

It is certainly a rule of the common law that the contract of a married woman is void. Her legal existence becomes merged in that of the husband, who, as he assumes her debts, acquires as it were, a dominion of her estate as well as her person. She could make no contract, the enforcement of which might deprive the husband of her society, or which could be obligatory upon her, because of the legal presumption that it was made under duress. The wife may impose a liability upon the husband by acting as his agent, by his express or implied authority, but then the contract

is his. The husband being liable for her support and maintainance, the law will oblige him to furnish it, and in case of his refusal, where necessaries are furnished to her, the law imposes the obligation and implies a promise on his part to pay for them. It would seem that her contracts are void by reason of incapacity to contract, and not voidable like those of an infant, to whom the law affords a protection, of which he may avail himself or waive at his pleasure.

But it has long been the established doctrine of courts of equity, that in regard to her separate estate, the wife may have rights independent of, and adverse to those of her husband, which will be protected, and her liabilities in respect of such estate, enforced in that forum. When we consider the increasing tendency of legislation in this, as in other States, to emancipate the wife from the dominion of the husband, by securing to married women their separate property, and authority to acquire and hold it in their own names, discharged from liabilities incurred by the husband, it behooves us to enquire whether it be the policy or design of such legislation to exempt the separate property of the wife from liability, though it might have to be enforced in a court of equity, upon her contracts in respect of such property. Wherever there is free agency and sufficient mental capacity, the right to contract, and the power of alienation ought to be inseparable from the ownership of property. It may indeed be limited within the period beyond which, the restraint would become obnoxious as a perpetuity, so that where a separate estate is settled upon a woman in contemplation of marriage, the terms of the settlement and the powers conferred by it might have to be pursued in order to enable the woman to charge her estate; yet it cannot be said to be the policy of the law in this country, that property should be tied up from alienation, or absolved from the just debts of the real owner; and the statute enabling married women to acquire and hold property directly, instead of through the intervention of a trustee, is one of the many evidences of the disposition to do away with the distinction between law and equity, or rather to require courts of law, in all cases where they are capa-

ble of affording adequate relief, to administer law in the spirit of equity.

Supposing in this case the money to have been fairly advanced or assumed to be paid, for the purpose of securing to the woman her separate property, or to quiet by way of compromise any doubtful claim of the husband to the usufruct, I apprehend it is not questioned; but that the claim of the plaintiff below was such as could have been enforced in a court of equity, and during her coverture as against the property. The parties were living apart, and the treaty was concerning her separate property. So far from the husband being liable, he was the adverse party in interest, and the wife by her agent or trustee, was contracting with him. The attorney thus acting as her agent, would have a lien in equity upon the property for the moneys advanced at her request, to secure her in the ownership or enjoyment of it. Even the court granting the divorce, if satisfied of the fairness of the transaction, might have made a summary order, requiring the money so advanced to be refunded, and charging the payment of it upon the property decreed to the wife. Because to the extent that a feme covert is capable of contracting, in a court of equity, she stands on the same footing with other persons, and is regarded as a feme sole, under no disability whatever. In the case of infants, who do labor under a disability, where they avail themselves of the privilege, any court having the power, would compel them to surrender an advantage or make restitution of property, which would cease to be theirs, and be unjustly retained upon the repudiation of the contract by which it was acquired.

So, a reasonable compensation for his services, to the attorney of a married woman, is chargeable upon her separate estate. If the suit is for divorce, the complaint on the part of the wife, seldom made out of levity, but more often resorted to as a desperate remedy for intolerable wrongs, though not to be encouraged, is so far favored, that the court to which she appeals will endeavor to place her upon something like an equality with the contesting husband. If she have no separate estate the allowance to her for maintainance pending the suit, or for alimony by the decree,

are funds out of which she might be required to compensate her attorney. To deny to her the power of binding her estate for the retainer of competent professsional aid, so far from being an advantage, would be to disarm her in a contest already unequal, and require her to come into court defenceless save as an object of sympathy.

I am clearly of opinion, that if the jury believed the facts which I suppose the evidence conduced to prove, (leaving out of view another feature in the cause to be presently noticed,) the plaintiff below was entitled to recover upon the express promise of the defendant after she became discovert, without any new or further consideration for the promise being made to appear: and I rest my opinion distinctly upon the ground that the promise was binding, not by force of any mere moral obligation resting upon her, but because the contract or agreement made during coverture, whereby she received an advantage, and the plaintiff below suffered a disadvantage, was of such a nature as to be valid and binding upon her estate as a feme covert and a sufficient consideration to uphold her promise as a feme sole.

I do not understand the case of *Lee vs. Muggridge*, 5 *Taun.* 36, and the cases which followed it, to have been doubted or overruled, except to the extent of the loose expressions contained in that case, to the effect that any moral obligation is a sufficient consideration to uphold an express promise. The law is now well settled the other way, and without tracing the course of the decisions, a correct exposition of it is contained in the more recent cases of *Eastwood vs. Kenyon*, 11 *Ad. & Ellis* 438, in England, and *Greer vs. Archer*, 2 *Barbour Sup. Ct. Rep.* 420, among many decided in this country. Strictly speaking, a moral, distinguished from a legal obligation, and where there never was anything more than a moral obligation, is never a sufficient consideration to uphold an express promise. Many instances may be imagined where a person of refined feelings and cultivated mind would hold himself, or consider another bound by strong obligations of gratitude, where voluntary compensation might well be made, but where no promise for future compensation

34

could raise the duty to the standard of a legal obligation. Such duties belong to that class of imperfect obligations, binding in conscience, but which the law does not recognize and will not enforce, because it cannot appreciate the consideration, or estimate the damages for a breach of duty. Indeed, no greater change in the fabric of the common law could well be conceived, than for the courts to put moral obligations upon a footing of equality with valuable considerations to uphold contracts. Besides the vague and indefinite nature of such obligations, the liability to unjust preferences of them over creditors whom the law has recognized as more meritorious, will suffice without any further conjecture, to illustrate the startling consequences that would result from such a change. The rule deduced from a review of the cases contained in the note, so often cited and approved, to *Wennall vs. Abney*, 3 *Bos. & Pul.* 249, excludes the idea of a mere moral obligation as a sufficient consideration to support a promise, by confining its operation to those cases where there was a precedent good consideration to support an express promise, or from which the law would imply a promise, which might have been, or could yet be enforced, but for the operation of some positive rule of law, as for instance, a debt once valid and subsisting, but discharged in bankruptcy, or barred by limitation, or the contract of an infant which he may confirm at majority.

It may somtimes be difficult to distinguish between what are legal and what are moral obligations, but when ascertained, the distinction has no peculiar application to the contracts of married women, or their moral obligation for benefits conferred. It is applicable alike to all persons who have full capacity to contract. If the agreement of a feme covert to contract is valid, so as to be obligatory in equity, her promise after she becomes discovert need not depend upon the moral obligation; nor is the promise of one, not under a disability, aided by any moral obligation where there never was a precedent good consideration.

It is true the original contract of the defendant below, while a feme covert, could not have been enforced against her in an action at law; but if I am right in concluding that it was one for

her benefit, which equity would sanction and enforce in her favor and against her estate, it would seem to be a technical and unfounded distinction to hold that there was no consideration to uphold her subsequent promise, because the original contract could not have been enforced at law. I take it to be the spirit of the rule given in the note to the case in 3 *Bos. & Pul.*, that wherever the promisee had a right, upon a good consideration, of which he might have availed himself, at law or in equity, against the promisor, and whether in the prosecution or defence of a suit, such right, though it has become unavailing, is a sufficient consideration to uphold a promise to continue or renew the former liability. The case of *Littlefield vs. Shee*, 2 *Barn. & Adol.* 811, where the plaintiff, a butcher, had supplied the defendant, when a married woman, with meat for her own use, while her husband was abroad, and after his death she promised payment, does not militate against the position that the defendant may be liable upon her promise in this case, because there, supposing the declaration to have been free from any objection, the court must have held that if anybody was liable to the plaintiff it was the husband, it being in law his debt and not that of the wife, for whose subsequent promise there could have been no consideration beyond the supposed moral· obligation. So, in the case of *Watkins vs. Halstead*, 2 *Saund. Sup. Ct. Rep.* 311, where goods were furnished to a married woman living apart from her husband, and having a separate property held for her by a trustee, and after being divorced from her husband, she promised to pay for the goods, the court say, "It is not pretended that independently of the express promise of the appellant, after she obtained her decree of divorce, this action could be sustained. If when the debt was contracted, when the goods were delivered any person was liable it was the husband. *We see nothing in the case to exempt him from liability.* The appellant was then a feme covert and clearly not liable. Her promise to pay was made after she was divorced, and if that promise is not supported by adequate consideration, the action must fail." Assuming therefore, at the outset, that the original promise was not binding on the wife,

and never could have been enforced against her, the court go into an examination of the cases and unavoidably conclude that the moral obligation resting upon her was not sufficient to support her subsequent promise.

The other point of law raised by the instructions, is settled by the decision of this court in *Neale vs. Newland*, 4 *Ark.* 506. See also *Logan vs. Williamson*, 3 *Ark.* 216. *R. E. Bank vs. Rawdon et al.*, 5 *Ark.* 569, and *Jordan vs. Adams.* 2 *Eng.* 348, that a negotiable note given and accepted in payment of a debt of a third person, becomes an extinguishment of it, and proof of this is sufficient evidence to support an action against the debtor for money paid. And upon so much of the case, as it come up on a motion for new trial, I would see no cause to disturb the verdict.

But the defendant below, in her motion for new trial, besides renewing the legal exceptions I have been considering, and also urging certain matters of surprise and additional evidence, which are laid wholly out of view as insufficient, moved for a new trial upon the ground, then for the first time presented to the court, that the original consideration for her liability to the plaintiff was illegal and immoral, in this, that the money was advanced to induce Viser, the husband, to withdraw his opposition to her suit for divorce, which if it be true, would be a clear case of collusion, in violation of the spirit of the statute concerning divorces, and contrary to public policy. And after some hesitation, because the defendant, moving for a new trial, seems to stand in the attitude of one, who should come into equity with clean hands, I think the court below should have granted a new trial upon this ground—not for any merit in the defendant, much less a demerit in the plaintiff who may have been acting for what he conceived to be the best interest of his client; not that I can assume the fact to be as claimed, because this as a question of fact was not put to the jury or passed on by them; but because there was evidence conducing to show that the money was paid to induce Viser to make no further opposition to the divorce, as well as to relinquish his claim to the negroes. And there being such evidence, it was not only the right but the duty of the court to have

interposed of its own motion, and put it to the jury to say whether this taint entered into and formed any part of the consideration, for which the three hundred dollars were paid, and to have charged them that if they so found, the plaintiff as to so much of his demand, could not recover. Because, otherwise, if both parties to an immoral contract, were content not to raise such objection, the courts might be compelled to adjudicate their alleged rights under contracts of that description, which the law would neither enforce nor rescind. It requires no enlarged inquiry into the policy of the statute concerning divorces, to lead to the conclusion, that if money is advanced or agreed to be paid in consideration that a party to a suit for a divorce will withdraw opposition, it amounts to collusion. The statute requires, in suits for divorce, at least a decent show of opposition, and where that is wanting, the courts should look to it with increased vigilance, that the complainant's allegations are fully sustained by evidence. If the money was advanced for the purpose in whole or in part of compounding the suit, it could not be recovered back from the party to whom it was paid, and the illegal taint would enter into and vitiate any new promise to refund made by the party, on whose behalf it was advanced.

For this ground alone, and not upon any other contained in the motion, I think a new trial should have been granted.

Mr. Justice Scott.

None of the reasons for the motion for a new trial are tenable, as I think, except that which sets up, that in the ground of liability presented by the plaintiff below there was such gross illegality as to be justly offensive to good morals and sound public policy, in this, that a part of that, for which he proceeded, was for money advanced to induce Viser, the husband, not only to relinquish his claim to the negroes in dispute, but to withhold his opposition to the suit of the wife for a divorce. The former might well be upheld, because of the law's high favor of compromises; but its abhorrence of collusion in a suit for divorce, is so great, that relief should be at

once given on such ground, even at the application of a *particeps criminis*. It does not give relief, however, in such case to the *party*, but to the public through the party, for the promotion of decency and public morals. And it will be afforded as well where there may be just demands united with one so tainted, as where the latter may be the sole foundation of the suit; because it is the public interest alone that the law thus seeks to subserve; and it was the party's own folly to mix a rotten demand with a sound one.

Nor should this ground of interposition by the court be any the less regarded, because it was not mooted during the trial in chief. So far from this, it is the bounden duty of the courts to guard the public morals of the country to the full *extent* of their powers, and for this purpose to interpose of their own motion for their vindication on all proper occasions. Nor does any matter touching public decency and sound morals, and the very pith of the leaven of social life, so much deserve the vigilance of the courts as this very matter of divorce. The marital tie, although a civil contract in the eye of the law, differs from all other civil contracts in one essential particular. The parties can never annul it by means either direct or indirect. Hence the inflexible rule of law, that the confessions of either party are *wholly incompetent* as evidence. Nor does our statute, which directs that "like process and proceedings shall be had in" divorce cases (*Dig. ch.* 58 *p*. 462, *sec*. 3,) "as are had in other cases on the equity side of the court," or in any other of its directions, or provisions, in any way alter or modify this vital rule of evidence touching the dissolution of the marital tie. Parties by their mutual consent, if of proper age and capacity to receive the sanction of the law, may make the marriage tie, but they can never break it according to the rules of law and the sound morals upon which it rests, by any express confessions, much less by those implied by a default of answer to a bill for divorce. A contrary rule, it would seem, could only be certified to the courts by express legislation, and even then, so great would be the inevitable abuses in its ad-

ministration, that it might not be totally unworthy of consideration whether it could have operation among men in harmony with the paramount laws of God.

But for this ground of the motion for a new trial, it might well enough have been refused, as it was, because leaving out of view this matter of illegality, in which the public was thus concerned,. and which the evidence seems to show to exist in fact, the verdict and judgment were well enough sustained. The compromise settled the property as the separate property of the wife, and certainly *quoad* this, she was a *feme sole* in a court of equity, and liable not only for her contracts concerning it, but also for others that touched her personal benefit, if not contrary to law; and it was not unlawful for her to sue for a divorce and employ counsel to sustain her suit.

I concur with my brother judges in awarding a new trial.

Mr. Justice WALKER.

This was an action of assumpsit brought by Bertrand against Mrs. Viser. The defendant pleaded the general issue, and the case was tried by a jury, who found a verdict for the plaintiff. The defendant filed her motion for a new trial, setting out various causes for the same, amongst which it may only be necessary to enumerate those which affirm that the court erred in the instructions given, and in refusing to give instructions asked by the defendant and that the verdict was contrary to the evidence,. to law, and to the instructions of the court. The motion for a new trial was overruled and the defendant excepted, setting out the evidence, and has brought the case here by writ of error.

The plaintiff's action is founded upon two items of charge, the nature of which we will proceed to consider. The first is for professional services rendered by the plaintiff in obtaining a divorce for her. These services were contracted for and rendered whilst the defendant was a feme covert, and therefore the contract as to her was void. The plaintiff admits this, but relies upon an express promise to pay after the divorce, upon the ground that, although no legal obligation rested upon her to pay,

that her moral obligation was a sufficient consideration for such express promise. If this contract had been voidable instead of void (as if made with an infant) the question would have been more free from doubt. The point of difficulty is whether, if no legal obligation ever existed, a moral obligation can be said to exist, such as will be a sufficient consideration to uphold an express promise to pay.

Upon examination of the authorities I think it may be said that there must be such legal obligation or a legal and sufficient consideratien, such as might have been enforced through the medium of an implied promise, had it not been suspended by the incapacity of the feme covert to contract. KENT, in his Commentaries, part 5, vol. 2, p. 258, says, "A sufficient legal obligation to do a thing is a sufficient consideration for a promise to do it; but it has been an unsettled point, whether a mere moral obligation be of itself a sufficient consideration for a promise, except in those cases in which a prior legal obligation or consideration had once existed. The weight of authority is that it is not sufficient."

And it is laid down by CHITTY in his work on Contracts, page 47, "That an express promise can only revive a precedent good consideration which might have been enforced at law through the medium of an implied promise, had it not been suspended by some positive rule of law, but can give no original cause of action, if the obligation on which it is founded never could have been enforced at law, though not barred by any legal maxim or statute provision." The same rule is laid down in 3 *Bosanquet & Puller* 244. *Smith vs. Vare,* 13 *John. R.* 258.

In the case now under consideration, although no legal obligation existed under which the defendant could have been compelled to pay for the professional services, still such services were a legal consideration which but for the rule of law that makes void the contract of a *feme covert,* a recovery might have been had upon an implied assumpsit, and consequently furnished a sufficient consideration to uphold an express promise made after the divorce to pay for them. Nor was it necessary in order to

make the express promise binding upon the defendant, to prove affirmatively that she knew at the time the express promise was made, that she was not bound in law by her former contract. This, in the absence of evidence to the contrary must be presumed.

As regards the other item of charge, the $300, the facts are these. The complainant sued her husband for a divorce, and also set up claim to several slaves, as her separate property. Defendant employed counsel and was preparing to defend, contesting the complainant's title to the slaves; but upon a conference between the complainant and the defendant, through their respective counsel, it was proposed that complainant would pay defendant $300, if he would relinquish his claim to the negroes, and make no further opposition to the divorce, which terms were agreed to, and at the request of complainant, the plaintiff in this suit and his associate counsel entered into an obligation to the attorney for the husband, binding themselves to pay him the sum of $300. This contract was entered into whilst the defendant in the present action was a *feme covert*. The relinquishment was procured from the husband by his attorney and delivered to the plaintiff, Bertrand, who still (so far as appears from the evidence) retains the same. No defence was made to the suit for a divorce, and after it was obtained, the defendant repeatedly promised to pay the sum so secured by plaintiff and his associate counsel, Lincoln. But there is no proof that defendant requested plaintiff to pay said sum after she was divorced. The payment of the $100, and the note for $200 seems to have been an arrangement between the plaintiff and the attorney for the husband without special directions or request from defendant, indeed she at one time, expressed to Webb, a witness, fears that her attorneys had not acted fairly with her, and had in fact not paid the sum aforesaid. The testimony of the other witnesses, it is true, acquits the plaintiff of all unfairness, but so far as the latter arrangement of payment is concerned, this goes to show that representations had been made to her about the payment of the money, with regard to the truth of which she was not satisfied. In view

35

of the whole of the evidence, there can be no doubt of a full re-cognition of the contract made whilst defendant was a *feme covert*, and of her promise to pay it after the divorce; but there is no evidence of any new contract made after that time, nor does it appear from a careful review of the whole of the evidence, that Bertrand, the plaintiff, took in the obligation of himself and Lincoln, and paid the $100, and gave his note for the balance at the instance of the defendant or with her consent.

Waiving then the consideration of the question, as to whether the promise to pay the $200, could be given in evidence under the counts in the declaration, the main question is, that conceding the money to have been paid either before or since the divorce was obtained, was this a precedent good consideration which might have been enforced at law, through the medium of an implied promise, had it not been suspended by that rule of law which denies the validity of the wife's contracts made during coverture.

The item of charge for professional services was alone encumbered with this positive rule of law. The subject matter of the contract was not against the law, or the policy of the law. But with regard to this latter item, the $300, a part at least of the consideration and inducement to the contract was, that the husband should offer no defence to the suit for a divorce. This was clearly against the policy of the statute in regard to divorces, under the provisions of which, the particular grounds of complaint must be set forth in the bill and sworn to. And the complainant is also required to swear that the complaint is not made through levity, or by collusion, fear or restraint, between complainant and defendant, for the mere purpose of being separated from each other, but in sincerity and in truth, for the causes in the bill set forth.

The contract of marriage, unlike ordinary contracts of business, is one which the public, as well as the individuals contracting, is interested in preserving unbroken, unless *for such causes as are specially set forth in the statute*, and *these causes must in fact exist, and must be shown to exist by evidence.* No

admissions of the defendant, whether by answer or by failure to answer, will supersede the necessity of proof of the truth of the allegations in the bill. And every contract not to defend or withhold evidence which, if produced, would tend to disprove the allegations in the bill, is clearly in violation of the spirit of the statute, and should not be enforced.

This question was distinctly presented in the case of *Sayles vs. Sayles,* 1 *Foster's N. H. Rep.* 312, in which the validity of a contract not to defend against a suit for divorce came up: and there no question arose as to the capacity of the parties to contract, because the husband executed the note, and the suit for divorce was by him, not the wife, as in this case, so that the whole question turned upon the validity of the contract, in reference to the subject matter about which it was made. There the husband filed his bill for a divorce; pending the suit, conversations were held between the counsel of the respective parties which resulted in an agreement by which the complainant executed a note for $400, payable to the son of the wife, and delivered to a third person, with the understanding that if the complainant succeeded in obtaining a divorce, and if opposition to obtaining the divorce was withdrawn by the wife, then upon the application to the holder of the note, it was to be delivered up to the wife or her agent.

It appears that no defence was made, and that the divorce was obtained and the note delivered up, and suit brought upon it. It was in proof that the consideration and inducement for making the note, was the withdrawal of opposition to the divorce and some contribution towards the support of the wife by the son to whom the note was executed. The defence set up by the husband against the payment of this note was, that the note was illegal and void, as being against public policy. Upon this state of facts, the court said, "The evidence in this case pretty fully establishes a case of collusion between the parties, to obtain a divorce at the hands of the court, when both parties knew or had good reason to believe that no sufficient legal excuse for it existed. No such agreement, even if executed, can form a valid consideration for either a verbal or written promise. The great

and principal object of the agreement made between the parties was, to bring about a dissolution of the marriage contract, and to put an end to the various duties and relations resulting from it. A contract having any such purpose, object and tendency, cannot be sustained in law, but must be regarded as against sound public policy, and consequently illegal and void." In this case there was no want of capacity to contract, and the contract was reduced to writing and delivered up after the divorce was obtained, and yet it was held upon grounds of public policy to be void.

This rule is firmly established. The object of the law is to suppress vice, and to promote the general welfare of society, and no individual shall be assisted by the law in enforcing a demand originating in a breach or violation on his part of its principles. *Chitty on Con.* 673. *Craig vs. State of Missouri,* 4 *Peters Rep.* 410. 2 *Humph. Tenn. Rep.* 1. 1 *Maule & Selw.* 593.

And in the enforcement of this rule neither party has any just cause of complaint. It is true that the objection comes with a bad grace from the defendant, who has reaped the benefit of this agreement by obtaining the divorce; but it is not for her sake that the objection is allowed. It is founded upon principles of public policy, which forbids that courts should lend their aid to one who founds his cause of action upon an illegal act.

Such being my view of the law governing the contract upon which the action in this case is founded, I will proceed to consider such of the instructions of the Circuit Court as bear upon this point, the determination of which should, I apprehend, suffice to settle the whole case.

The court, in my opinion, correctly instructed the jury that the contract of a feme covert was void, and as related to the $300, also correctly instructed, that a subsequent express promise made after she became a feme sole, to pay such contract, would not bind her; but then, I think, the court improperly instructed the jury, that if defendant made a new contract upon sufficient consideration to pay the $300 and the fee, they might find for the plaintiff; because in the absence of any instructions as to what

was a sufficient consideration, the jury might have supposed the consideration upon which the contract was originally made was sufficient to uphold the new promise, and it was objectionable also, because there was no evidence whatever of any new contract, and therefore the instructions tended to mislead the jury.

The court also erred, in my opinion, in giving the instruction asked for by the plaintiff, the substance of which was, that a promise to pay after the divorce, and before suit brought, would, if proven, entitle the plaintiff to recover under the account stated; because, in order to entitle the plaintiff to recover the $300, it was not only necessary to prove an express promise within the time as set forth in the instructions, but also that said promise was upon a present or prior legal consideration, and so far from such being the case, to have made the instructions full, and such as would truly have applied to the state of the evidence, the court should have instructed the jury that a contract made in consideration (in whole or in part,) that the defendant, in a suit in chancery for a divorce, would make no defence to the suit, was against public policy and void, and that if such appeared to them to be the case in this suit, they should find for the defendant, so far as the plaintiff's right of action was founded upon such contract.

The last instruction given appears to me still more objectionable than either of these. It was that a valuable consideration received upon the original contract, even though the contract might be void, was sufficient to uphold a new promise to pay, made after the divorce. If void alone because of the incapacity of the defendant to contract, then the instruction might have been sustained, but when void also, because the consideration was illegal, as in this case, it was the very reverse of the law as applicable to the state of facts before the jury.

I conceive it unnecessary to consider the other exceptions, as from the view which I have taken of the case, the plaintiff might well have recovered under the count for professional services, but could not, under any form of pleading, recover the sum of $300, assumed by him to the attorney for the defendant.

I am of opinion that the judgment ought to be reversed, and the cause remanded with instructions to grant the defendant a new trial.